COMMISSIONER OF INTERNAL
REVENUE v. MOORE.

MOORE v. COMMISSIONER OF
INTERNAL REVENUE.

No. 13125.

United States Court of Appeals
Ninth Circuit.

Sept. 21, 1953.

Rehearing Denied Nov. 5, 1953.

Melvin D. Wilson, Los Angeles, Cal., for petitioner, Mary Young Moore.

Ellis N. Slack, Acting Asst. Atty. Gen., Lee A. Jackson, Hilbert P. Zarky, Special Assts. to Atty. Gen., Washington, D. C., for Commissioner.

Before STEPHENS and POPE, Circuit Judges, and BEAUMONT, District Judge.

POPE, Circuit Judge.

For consideration here are petitions by both the above named parties for review of two decisions of the Tax Court relating to claimed deficiencies in the income taxes of the taxpayer Mary Young Moore for the years 1943, 1944 and 1945. The Tax Court upheld taxpayer's claim of a right to make deductions from gross income on account of depreciation attributable to a half interest in a building located in Los Angeles, but rejected her contention that additional deductions should be allowed through amortization of a lease upon the lot where the building was located.

Taxpayer and her mother, Mrs. Mary C. Young, were the owners of the lot of land mentioned, when, on October 1, 1924, they executed a 99 year lease to Sun Realty Company as lessee. The lease required the lessee to demolish a building then on the premises and to construct at its own expense a new building thereon to cost not less than $2,000,000. Rental was to be $10,000 per month until June 30, 1926, and $20,000 per month thereafter for the entire remainder of the term. Lessee agreed to pay all taxes and other levies and charges on the property. The lease contemplated the making of a sub-lease to Barker Bros. Corporation, and such a lease, for a term of 35 years, was executed with the approval of the original lessors, on October 30, 1924. The building called for in the original lease was completed January 1, 1926.

The mother died November 3, 1938, and by will left her half interest in the property to her daughter. The latter, as executrix, filed a Federal Estate Tax return, and by compromise with the Commissioner of Internal Revenue, the value of the estate's half interest in the property was fixed at $1,533,100. The estate tax proceedings made no segregation or itemization of the elements considered in making up that valuation.

There was no testimony (manifestly there could have been none), as to how the agreed figure of $1,533,100 was arrived at. However, expert witnesses for the taxpayer gave their opinions as to the values of the land, and the building, as of November 3, 1938. In substance they testified that on that date the building was worth $1,605,000. This they arrived at by computing reconstruction cost on that date, and deducting therefrom depreciation at 2 percent per year from the date of construction to 1938. They gave their estimate of the then value of the land alone as $800,000, and noted a difference between the totals of these two figures and twice the agreed figure of $1,533,100, or $3,066,200, and attributed this difference of $661,200 to "the favorable lease".

Two expert witnesses were likewise called by the Commissioner. One of them, who testified that a half interest in the land was worth $660,000 and a like interest in the building was worth $873,100 on November 3, 1938, (the two figures totaling the agreed sum of $1,533,100), expressed the opinion that the lease, when made, was at "the going rate"; that it at no time had a "bonus value", and he found no value attributable to a "favorable lease". The other witness, whose values for the half interest were $750,000 for the land and $783,000 for the building, was of the opinion that the lease produced substantially higher rentals than other rentals in the general area, and that the existence of the favorable lease was responsible for half of his $750,000 figure for the land.

In upholding taxpayer's claim to an allowance by way of depreciation on account of the building, the Tax Court followed and restated the rule announced by it in Currier v. Commissioner, 7 T.C. 980, and Pearson v. Commissioner, 13 T.C. 851. After referring to the proposition that during the life of taxpayer's mother, neither of the lessors could deduct depreciation "for the reason that (they had) no investment or cost therein which is subject to exhaustion", the court expressed its ruling as to the half interest which taxpayer inherited from her mother by quoting from its decision in the Currier case as follows: "The basis of inherited property is accordingly not

cost, as it was in the Detroit Edison [Detroit Edison Co. v. Commissioner, 319 U.S. 98, 63 S.Ct. 902, 87 L.Ed. 1286] and Reisinger [Reisinger v. Commissioner, 2 Cir., 144 F.2d 475] cases, and to say that a property cost the taxpayer nothing makes no contribution to the solution of the present question. As opposed to cost, the basis of property acquired by devise is categorically fixed by statute as fair market value on the date of acquisition. Internal Revenue Code, sec. 113(a) (5), 26 U.S.C.A. § 113(a) (5). Hence, if we can discover the fair market value of the property in question at the date of decedent's death, Augustus v. Commissioner, 6 Cir., 118 F.2d 88 [38] (or the figure at which it was returned for estate tax purposes, which is recognized as the equivalent, Regulations 103, sec. 19.113(a) (5)) the upshot would ordinarily be its basis for depreciation in petitioner's hands, without any reference to its 'cost'. Having acquired a basis by the incident of the estate tax, the gradually disappearing value of a wasting asset can not be replaced except by periodic depreciation adjustments." Holding that the taxpayer "will suffer some loss due to depreciation", the court found that the fair market value of taxpayer's one-half of the building at the date of the mother's death, November 3, 1938, was $800,000, and that it had a 50 year life.

In attacking these conclusions the Commissioner says that they overlook important facts bearing on the real interest of the taxpayer. He points to the fact that because of the long term lease, taxpayer's interest in the building gives her no more than the prospect of possessing it in the year 2023, long after the building's useful life will have terminated and its value have been exhausted. This, says the Commissioner, is an interest "completely devoid of value". He argues that the essential error in the Tax Court's decision is that it arrived at a conclusion as to depreciable values in

complete disregard of the lease, with its 99 year term extending beyond the useful life of the building.

■ We think the Commissioner's point is well taken. True it is that Internal Revenue Code, sec. 113(a) (5) provides: "If the property was acquired by bequest, devise, or inheritance * * * the basis shall be the fair market value of such property at the time of such acquisition." But "such property" is not the steel frame, brick and terra cotta loft and store building on the corner of Figueroa, Seventh and Flower Streets in the City of Los Angeles,—it is the taxpayer's *interest* in that property.[1] And her interest is a limited one, not only because it is a fractional part, but also because it is subject to the lease. As the Tax Court said, dealing with another point in this case: "What petitioner inherited from her mother was an undivided half interest in the land under the Barker Bros. building *and a reversionary interest in the building.*" (Emphasis added.)

When it became necessary to appraise, for purposes of the Federal Estate Tax, the bundle of rights which passed to taxpayer from her mother's estate, it is plain that first to receive attention would be the interest in the fee, and the right to the rents reserved in the lease, which right to rents grew out of the ownership of the land. If there was any other right in this bundle, it was the right to possess the building in the year 2023. What would have been the fair market value of that right on November 3, 1938? No testimony before the Tax Court touched this question.

■■ It is not the physical property itself, nor the title thereto, which alone entitles the owner to claim depreciation. The statutory allowance is available to him whose interest in the wasting asset is such that he would suffer an economic loss resulting from the deterioration and physical exhaustion as it takes place.

1. Title 26, Sec. 811: "The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property * * *

(a) Decedent's interest. To the extent of the *interest therein* of the decedent at the time of his death; * * *." (Emphasis added.)

Thus the lessee, obligated to make improvements, may recover his capital outlay by deductions for depreciation notwithstanding title to the improvements may be in the lessor. Helvering v. F. & R. Lazarus & Co., 308 U.S. 252, 254, 60 S.Ct. 209, 84 L.Ed. 226; Duffy v. Central R. Co., 268 U.S. 55, 45 S.Ct. 429, 69 L. Ed. 846; Treasury Reg. 111, Sec. 29.23 (a) 10.[2] And also, where the lessor erects the improvements, (and has title to them), but where the lessee undertakes to make good the physical exhaustion as it takes place, the lessor may not make such a deduction. Georgia Ry. & Electric Co. v. Commissioner, 5 Cir., 77 F.2d 897, certiorari denied 296 U.S. 601, 56 S.Ct. 117, 80 L.Ed. 426; Commissioner of Internal Revenue v. Terre Haute Electric Co., 7 Cir., 67 F.2d 697, certiorari denied 292 U.S. 624, 54 S.Ct. 629, 78 L.Ed. 1479. Here, so far as economic loss is concerned, taxpayer's interest in the building at the end of the 50 year life on November 3, 1988, will be fully as valuable as her interest therein on November 3, 1938. We think the Commissioner is right in his statement that "so far as the rights reserved by the lessors were concerned, the existence of the building and its depreciation, were matters of economic indifference. Their right to receive the ground rentals and to have possession of the property at a future time when the building would no longer possess value, was not diminished by the physical exhaustion of the building."

■■ The Tax Court properly noted that section 113(a) (5) would operate to supply, for an inherited half interest, a "basis" which had theretofore not existed, and which continued to be nonexistent with respect to taxpayer's original half interest. But a "basis" is only one of the factors which must exist before depreciation may be claimed. More important is the necessity of a "depreciable interest" in exhausting and deteriorating property. If the taxpayer's interest is of such character that it is not affected by the deterioration, then it is not of a depreciable nature. That the provision defining basis is by itself insufficient to authorize the deduction was well stated by the Court of Appeals for the Eighth Circuit in First National Bank of Kansas City v. Nee, 190 F.2d 61, 64, as follows: "It must at once be obvious that unless an item of property in respect of which depreciation has been claimed is properly within the reach of the quoted portion of the statute, those further provisions of the law are quite irrelevant which serve merely to define the basis upon which depreciation, validly asserted, is to be computed. The prescription of a depreciation basis presupposes, but does not amplify, depreciability."

■ Here, the Tax Court, after referring to the provisions of Sec. 113(a) (5), and noting the acquisition of a "basis", assumed that this was an end of the matter. It said, in closing the foregoing quotation from the Currier case: "Having acquired a basis by the incident of the estate tax, the gradually disappearing value of a wasting asset can not be replaced except by periodic depreciation adjustment." But Sec. 113 (a) (5), while providing a "basis", does not create a depreciable interest where none would otherwise exist.

The proof of values offered on behalf of the taxpayer ignored the difference between a building unaffected by a lease, and a building subject to a lease. Thus one of taxpayer's experts arrived at his testimony of value of the building by computing its reproduction cost as of November 3, 1938, then subtracting depreciation from the date of construction, and concluded with a figure of $802,000 as his value for the half interest.

In First National Bank of Kansas City v. Nee, supra, the court criticized the taxpayer's similar testimony on the ground that it neglected "both the real ingredient of value in the estate tax appraisal *and the actuality of the Williams lease*

2. See note 6, infra.

*of the land alone."* [3] (Emphasis supplied.)

Another case which suggests the view that this testimony of a value of $802,-000 for the half interest in the building was completely irrelevant is Commissioner of Internal Revenue v. Pearson, 188 F.2d 72, 74. There the Court of Appeals for the Fifth Circuit reversed one of the two decisions upon which the Tax Court here relied.[4] In that case it was stipulated that the building (which the lessees, under the terms of a 65 year lease from the taxpayer's ancestors, had constructed at their own expense), had a value of "at least $450,000". The Court said: "Upon the record as a whole, the stipulated value of the building is not at all determinative of the question posed here. Indeed, it is without material bearing on it. It does not purport to deal with, much less to settle, what value, if any, was attributed to the building alone for estate tax purposes. It cannot on this record be taken as proof that the building was accorded any value as a depreciable asset in the hand of the taxpayer." 188 F.2d at page 75.

It is true that under the facts of that case it appeared from the record that the sum of $412,500, fixed as the value of the ancestor's interest in the property for estate tax purposes, had been based upon the value of the land alone. That fact made the case an easy one to decide. But that court's comment that the stipulated value of that building was "without material bearing" upon the question before the court is also applicable to the finding here of an $800,000 value, based on reproduction cost less depreciation.

If those who did the stipulating, differing from the Tax Court, considered that the inherited interest was one in a building *subject to a lease*, they may have attached little or no value to the interest in the building. In the Nee case, supra, the court was considering an estate tax appraisal of $125,000. The court said: "At Mrs. Williams' death the lease provided an annual rental very shortly to reach $10,000.00 for nearly ninety-four years. $10,000.00 is eight percent of $125,000.00; four percent of $250,000.-00. As the Court of Appeals concluded in the Pearson case, so here on even surer grounds, the entire estate tax valuation should be attributed to the land with the lease."

In like manner here we note that the average annual rental received during the period 1935–1944 was $266,900. Capitalized at eight percent this would produce a sum in excess of $3,300,000; at four percent it would make over $6,660,-000 as the total value, this on the assumption that this rental could be collected indefinitely. Thus it might have been that the $1,533,100 represented the assumed value of the land alone.

In the Nee case, supra, the court noted the possibility that under that lease, and under the local law, the legal title to the building may have been in the lessee rather than in the lessor's successor, the taxpayer. But it treated that question as not decisive, and found it unnecessary to determine it. That court worded its conclusions in language which incorporated phrases taken from Sec. 23(*l*) of the Revenue Code.[5] It said, 190 F.2d at

---

**3.** The court described the testimony as follows 190 F.2d at page 72: "The oral testimony in behalf of the bank was presented in its effort, by establishing separate valuations for the building and the land, both unaffected by the lease, proportionately to resolve the $125,000.00 valuation into two items, one the value of the building the other that of the land, and thereby to meet the test of the statutes already quoted, especially Title 26 U.S.C.A. § 113(a) (5) and the cited language of Section 29.23(*l*)–4 of Chapter I, Title 26 C.F.R. But it complete-

ly neglects both the real ingredient of value in the estate tax appraisal and the actuality of the Williams lease of the land alone."

**4.** In the opinion below the Tax Court spoke of the Pearson case as involving "facts even more closely paralleling those of this case than did the facts of the Currier case."

**5.** "§ 23. Deductions from gross income. In computing net income there shall be allowed as deductions: * * * (*l*) (As amended by Sec. 121(c), Revenue Act of

page 65: "But we are equally satisfied that the building was not 'held for the production of income' within the intendment of subsection (2) introduced later into the statute by amendment and made retroactively applicable to the taxable years 1940 and 1941. We consider that the expression 'held for the production of income' must be understood as requiring for its applicability that property be held *by the taxpayer* for the production of income *for or to him.* * * * The building unquestionably produces, and was designed to produce, income; but not for the lessor or her successors."

That the conclusion of the court, thus couched in the language of Sec. 23(*l*)(2) was not derived from a mere textual interpretation of that section, is apparent from the court's discussion of the very questions which, as we have heretofore indicated, we regard as determinative of the matter which is before us. The court said: "Putting aside for further consideration the admittedly indecisive question of the existence in the bank of legal title to the building, it is demonstrable from the documentary evidence in the case that no income accrued to the lessor or was intended to accrue to her or her devisees or assigns from that structure. The lessor reserved and received, and her successors continue to receive, rent solely from the ground. That was all Mrs. Williams had to lease * * *." 190 F. 2d at page 66.

And speaking of the bundles of rights acquired through the will by the taxpayer, the court said: "But the bank claims that, having acquired the right and title of the lessor by devise, it has under the cited statutes (supra) a valid basis for depreciation. * * * The interest, title and right thus owned by her and transmitted seem to have included * * * these items, (a) the title in fee simple * * *; (b) the right to receive the prescribed rentals * * *; (c) the right from time to time to examine and inspect the premises * * *; and (d) the reversion in the property, subject to and as provided in the lease either at its contemplated termination or upon voluntary surrender or an elected cancellation for default together with the full ownership of such building as, at the time of such termination or cancellation, shall be located on the land. That building may be, but if the lease runs its contemplated course, almost inevitably will not be, the one now in existence, for the close of the prescribed term of the lease is almost a half century beyond the end of the agreed useful life of the building." 190 F.2d at page 67.

It is thus apparent that the testimony of the witnesses, and the findings of the Tax Court, based upon the value of the building alone, viewed as a physical structure, do not reflect the taxpayer's true interest in that building, as that interest is, in fact, affected by a lease whose term exceeds the useful life of the building.

■■ This brings us to the question as to whether that interest has a value, and if so, how it should be ascertained. The Commissioner says that necessarily the value is zero; hence, that there is no occasion for remanding the case for further findings. He says this must be true, first, because the ground rent which arises out of the taxpayer's ownership of the land, will come in forever; hence taxpayer must be a stranger to any economic loss as the building wears out. Also, he argues, since taxpayer could not conceivably sell her interest in the building apart from the land or the rentals, the value of her interest is nothing. We see no answer to this argument. And we suggest this further consideration that leads to the same result: Since, as above stated, taxpayer's interest in the building at the end of the 50 year life will be fully as valuable as her interest therein on November 3, 1938, we have

---

1942, c. 619, 56 Stat. 798) Depreciation. A reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—(1) of property used in the trade or business, or (2) of property held for the production of income."

no such wasting asset as is required for any depreciation.

An interesting sidelight upon the probable intent of the Code provisions in this situation is furnished by the rule relating to the right of the tenant to claim depreciation upon this building. This is recognized in Regulations 111, Sec. 29.23(a)–10.[6] The right of the lessee to make such a deduction was upheld in Duffy v. Central R. Co., 268 U.S. 55, 45 S.Ct. 429, 69 L.Ed. 846. A construction of the law to permit not only the lessee (who has a real economic interest) but also the taxpayer here to take depreciation on the same building would be somewhat anomalous.

The circumstances just mentioned disclose one reason why Crane v. Commissioner, 331 U.S. 1, 67 S.Ct. 1047, 1052, 91 L.Ed. 1301, upon which taxpayer relies, does not support the Tax Court's decision on this point. There the Supreme Court held that one who inherited an apartment house worth $262,000, subject to a mortgage of $262,000, was chargeable with an amount of gain on resale which was arrived at on the assumption that the mortgagor could take depreciation on the value of the building, notwithstanding her equity was zero. But there, as the Court was careful to point out, the mortgagor remained in possession, the mortgagee could not take depreciation, and unless the mortgagor could take it, the effect would be to "deny deductions altogether." Here, to disregard taxpayer's limited interest, and permit her to take depreciation on the full value of the building, while lessee is properly claiming deductions based on the same values, would result in having deductions taken on the same building's depreciation twice.

The taxpayer contends that the Commissioner is not in a position to argue here that the Tax Court was in error in finding a value of the building with respect to which the taxpayer might calculate and deduct depreciation in that the Tax Court failed to take into consideration that her interest in the building must be viewed as one subject to the lease. This is an argument which the taxpayer says the Commissioner did not present in the Tax Court, and in arguing it here, the Commissioner has presented a theory and made an argument which was presented for the first time in this court. Therefore it is said that the Commissioner cannot urge as a ground for reversal of the Tax Court a theory which he did not present in the court below, under the rule stated in United States v. Waechter, 9 Cir., 195 F.2d 963. We find no basis for this contention. The record certified to this court contains the briefs filed by the parties in the Tax Court. From the Commissioner's argument made therein it is apparent that his present contention was presented to that court.[6a]

6. "The cost borne by a lessee in erecting buildings or making permanent improvements on ground of which he is lessee is held to be a capital investment and not deductible as a business expense. In order to return to such taxpayer his investment of capital, an annual deduction may be made from gross income of an amount equal to the total cost of such improvements divided by the number of years remaining of the term of lease, and such deduction shall be in lieu of a deduction for depreciation. If the remainder of the term of lease is greater than the probable life of the buildings erected, or of the improvements made, this deduction, shall take the form of an allowance for depreciation. * * * If, in any case, the life of the improvements is less than that number of years the lease has to run, including the renewal period if properly to be considered, the deduction for depreciation with respect to such improvements shall be spread only over such life."

6a. The Commissioner's brief argued:— "While respondent admits that petitioner had a basis of $1,533,100 for a half interest in the entire property, respondent contends that no part of such basis is properly attributable to the building erected by the lessee. Where vacant land is leased on a ninety-nine year lease and the lessee is obligated to erect a building at no expense to the lessor, it is clear enough that the rent reserved in the lease reflects no cost or investment on the part of the lessor in the building to be erected subsequently by the lessee."

We now reach the point urged by taxpayer as petitioner, namely, that she should be permitted to amortize certain values claimed to attach to the lease, (or to take depreciation calculated with respect to those values). Three of the expert witnesses testified that the lease was a very favorable one. As one witness for the Commissioner put it, "the lease was on a basis very substantially above all of the other rentals in the general area". One witness for taxpayer described the lease as "favorable", and the increased values he attached to the property on account of the rentals paid as an "increment in lease, which is a vanishing investment". All of these witnesses were of the opinion that the rents reserved in the lease exceeded those obtainable for the same or similar property in 1938, and that this circumstance added materially to their estimate of the value of the property. The witnesses for the taxpayer added this "increment", part to the value of the land, and part to the value of the building.[7] On the contrary, the witness called by the Commissioner who found added value in the favorable lease,[8] gave it as his opinion that this increased value was properly reflected in the value of the land itself.

Taxpayer's contention before the Tax Court was in the alternative. She argued that the amount of the added value due to the lease being a favorable one should be apportioned between the land and building, as her witnesses had testified, (see note 7), and hence that the depreciation on the building should thus be greater; or, if that be not allowed, the lease should be treated as a separate capital asset which she should be permitted to amortize. These contentions the court rejected, holding that "the right to receive rent under the lease to which the land was subject at the time of her mother's death was merely incident to the ownership of the fee. The lease grew out of the land, is reflected in the value of the land, and it neither constitutes a separate capital asset, nor increases the value of the building."

In Young v. Commissioner, 9 Cir., 59 F.2d 691, 692, this court had before it a question arising out of this same lease. As there appears, when this taxpayer and her mother entered into the 99 year lease, there were buildings on the lot which were demolished in order to make way for the new building. The owners also, in securing the lease, incurred expenses for real estate commission, attorneys' fees, and title certificates. The question was whether taxpayer and her mother could deduct, in that year, the payments made for these expenses plus the full depreciated cost of the buildings demolished. This court affirmed the decision of the Board of Tax Appeals, Young v. Commissioner, 20 B.T.A. 692, that these items constituted expenditures "in the acquisition of a capital asset and that any deduction allowable is by way

The rental represents solely a return for the use of the land. The only interest the lessor has in the building is its security for the payment of the ground rent. Cf. First National Bank, Trustee, v. Nee, (D.C.Mo.1949 [85 F.Supp. 840]) * * *. But a right to any improvements must be valued **subject to the lease.** If, as in the instant case, the improvements have a useful life less than the remaining term of the lease, the devisee will never have a right to use, enjoy or dispose of them during the term or thereafter. Consequently, reason precludes attributing any value to the improvements insofar as the devisee is concerned."

7. One of these testified: "Q. Why isn't it all reflected in land value? A. Be-

cause I don't think it is fair. You have got a unit of the two, land and building, with a permanent structure forming land and building, and I think the fair way to handle this increment in lease, which is a vanishing investment—it doesn't add the value so much to the land, any more than it does to the building." These witnesses added one-third of the assumed additional value to the land and two-thirds to that of the building, in proportion to the values they assigned to land and building.

8. Another witness testified for the Commissioner that the lease, when made, "was the going rate. In other words, at no time, in my opinion, has that lease ever had a bonus value".

of amortization over the life of the lease". This court stated that solution of the case depended upon "whether, by the acquisition of the long-term lease, the lessors added to their assets, or substituted property for another form of capital assets." In giving an affirmative answer this court said, 59 F.2d at pages 692–693: "On the other hand, where he finds it advantageous to remove substantial buildings in order to secure a lease which will result in his having erected on his property a new building, without money outlay on his part for its construction, and to have assured a large rental income for a long term of years, it would seem just and reasonable that the value of the buildings removed be charged as a contribution to the cost of securing his lease, and as a part of the investment then made for that purpose."

Thus this court there treated this 1924 transaction as the acquisition of a separate asset, apart from the land. The plan of amortization deductions there approved has been followed from that day down to and including the years here in controversy. (The record discloses that the Commissioner has allowed deductions for amortization of the items detailed in that former case from 1924 to 1945.) We perceive no reason why that lease should not be so regarded as a separate asset at this time.

Now, if we were dealing with a taxpayer who, on November 3, 1938, purchased a half interest in the whole property for $1,533,100, and if it appeared that at that time the rents being paid were in excess of the fair market rentals of the property, and if the price paid took this latter fact into consideration, it must have included a bonus or premium for the acquisition of the "favorable" features of the lease. Just as the benefits from the amounts representing demoli-

tion of the building and real estate commissions will have come to an end at the termination of the lease, so it may be possible to prove that the higher rents secured through the premium paid by such a purchaser would be exhausted and terminated when the lease ends,[9] or when the 1938 rate of rental comes to an end. The lease, or rather the portion thereof providing the above-normal rents, is an intangible asset with a definitely limited life. As the Supreme Court has said of depreciation: "The end and purpose of it all is to approximate and reflect the financial consequences to the taxpayer of the subtle effects of time and use on the value of his capital assets. For this purpose it is sound accounting practice annually to accrue as to each classification of depreciable property an amount which at the time it is retired will with its salvage value replace the original investment therein." Detroit Edison Co. v. Comm'r, 319 U.S. 98, 101, 63 S.Ct. 902, 904, 87 L.Ed. 1286. In our hypothetical case of a 1938 purchaser of this half interest, if the premium paid on account of the higher rents to be received under the lease may not be amortized by deductions over the period of the lease, his original investment will not be replaced as the Code contemplates. Applicable is Regulation 111, Sec. 29.23($l$) (3) relating to depreciation of intangible property: " * * * If, however, an intangible asset acquired through capital outlay is known from experience to be of value in the business or in the production of income for only a limited period, the length of which can be estimated from experience with reasonable certainty, such intangible asset may be the subject of a depreciation allowance. * * * "

 Here, of course, taxpayer is not a purchaser, but an heir. But the effect of Sec. 113(a) (5),[10] and of 114

9. The problem of proof that the lease is a favorable one, and that the favorable portion is a wasting asset, and subject to exhaustion, is discussed hereafter.

10. "§ 113. Adjusted basis for determining gain or loss. (a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that— * * * (5) Property Transmitted at Death. If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * * "

(a),[11] is to put the heir in the same position as if he were a purchaser. As stated in Reisinger v. Commissioner, 2 Cir., 144 F.2d 475, 477: "The purpose of the statute allowing deductions for depreciation is to permit the taxpayer currently to receive income tax-free to the extent that wear and tear and time decrease the value of his investment, *or what is treated as his investment,* in the property." (Emphasis ours.) It is the effect of Secs. 113(a) (5), 114(a) and 23(n),[12] to treat the values passing to the taxpayer as an heir "as (her) investment".

In the supposititious case of the purchaser of a half interest for $1,533,100, if taxpayer could prove the extent to which the lease was "favorable", or what part of the rents are "above normal", it should be feasible to ascertain the amount of the purchase price which represented a premium for the favorable aspects of the lease. Such would be no more difficult than the ascertainment of the proper basis for depreciation in the ordinary case where a purchaser buys a lot with a building thereon, all for a lump sum.[13] A similar determination of an appropriate portion of the stipulated estate tax appraisal sum, is within the special competence of the Tax Court.

In the case of Friend v. Commissioner, 7 Cir., 119 F.2d 959, the executors of a decedent lessor who had demised premises to tenants who erected buildings thereon, contended that the excess valuation placed upon the leases over what would have been a reasonable rental value of the land itself, was an exhaustible asset on which they were entitled to depreciation, amortization or exhaustion for income tax purposes. The court affirmed the decision of the Tax Court denying the right to make the claimed deductions. It noted that the taxpayers there, as here, asserted that they had acquired a basis for amortization by virtue of Sec. 113(a)(5). The court held that the statute gave a basis for valuation for the purpose of determining gain or loss only, and that it did not put the taxpayers in the position of a purchaser of leaseholds for a valuable consideration. The court said, 119 F.2d at page 961: "It is plain from a reading of the statute that what is meant is to give the asset, whatever it may be, a basis for valuation for the purpose of determining gain or loss for income tax purposes in the event of a future sale of the asset. The statute can not be construed, even in conjunction with the valuation for estate tax purposes and the payment of that tax, to place the petitioners in the position of a purchaser of the leaseholds for a valuable consideration. Therefore, the contention of the petitioners must fail, and their other contentions must fall with it."

What we have said discloses that we do not agree with the quoted statement. We think that the court there failed to note that Sec. 114(a) provides that the basis for depreciation is the same basis.

---

11. "§ 114. Basis for depreciation and depletion. (a) Basis for Depreciation. The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property. * * *"

12. Tit. 26, § 23(n) "Basis for depreciation and depletion. The basis upon which depletion, exhaustion, wear, and tear, and obsolescence are to be allowed in respect of any property shall be as provided in section 114."

13. See Reg. 111, Sec. 29.23(*l*) (4) quoted in part in note 6, supra. Cf. Cleveland Allerton Hotel v. Commissioner, 6 Cir., 166 F.2d 805, 807: "A second ground for the Tax Court decision was that it was unable from the facts of the case to allocate any portion of the purchase price of the land involved to release from the lease, and so was unable to find any basis for a depreciation deduction. But the Court had found it to be established that the land without the lease had a value of $200,000. The rest we think would be simple arithmetic. In determining a base for depreciation of improved property purchased without allocation of consideration to buildings as distinguished from real estate, there has never been any difficulty in determining the value of the improvements, * * *."

**276**

provided in Sec. 113. See also Sec. 23 (n).

In its decision below the Tax Court relied heavily upon its own decision which was affirmed in the case last cited as well as upon its decision in Martha R. Peters, 4 T.C. 1236. We cannot agree with either of those decisions.

■ Thus we hold that if the lease was one whose favorable rentals are subject to ultimate exhaustion, that portion of the $1,533,100 attributable to what we here call, for want of a better term, its "premium" value, should be amortized through annual deductions allowable to the lessor.

■ Respecting the period of such amortization, our attention is called to the fact that Sunland Investment Company had succeeded Sun Realty Company as lessee prior to 1938. It may assign the lease without the consent of the lessor, and be relieved of further liability, and its assignee may do likewise. It is argued that at the end of 1960, when the sublease to Barker Bros. will terminate, the latter will have no reason to renew its lease, and Sunland will then withdraw and escape further obligation under the lease. Thus it is asserted that the useful life of the lease will end in 1960. We think we are not warranted in indulging in speculation that this will occur, and that the amortization here contemplated must be based on the term of the lease itself.[13a]

■ In theory, the lease was, in 1938, a favorable one if it then provided greater rentals than could have been obtained under a lease negotiated at that time. Whether this particular lease measured up to this test is a question of fact for the Tax Court to determine.

If we are considering what our hypothetical purchaser would offer, by way of bonus or premium, for the favorable lease, upon a purchase of the property in 1938, it would be fair to assume that, if he could arrive at the 1938 fair market rental value of the land he could calculate his premium by comparing the capitalized value of the rentals obtainable on a 1938 lease, and payable over the remaining 85 years to 2023, with the capitalized value of the rentals of the existing lease, for the same period.[14] Plainly reliable testimony as to what rents a similar lease would command if negotiated in 1938 may be hard to come by in the absence of a showing that other similar leases were made at or about that time.[15] On the other hand, the Tax

13a. Of course, the possibility, or probability, that the lessee will cease paying the reserved rent in 1960, would be a factor which would have an important bearing upon what the supposititious purchaser, previously mentioned, would be willing to pay by way of premium for the favorable lease.

14. For the same reasons which led us to eliminate the value of the building as found by the Tax Court from the basis for depreciation, such building value forms no part of the calculation of the premium here.

15. Thus the witness who found no evidence of the lease being "favorable", or that the rentals were above current market, testified: "There is no other piece of property in the metropolitan area that is comparable to that piece of property. It was the one large holding, you might say, that was available in the early 20s for development. It was in one ownership and at that time it had 300 and some feet of frontage upon Seventh Street, which was deemed the best street available for commercial development. * * * You can get on any streetcar traveling on Seventh Street and get to any portion of Los Angeles by transfer. That was true of Broadway. They are the only two streets in the town that could be done. Seventh Street comes as near traversing the center of the City of Los Angeles as any street did in town. * * * So Seventh Street was the natural street to supplement Broadway in the commercial area, and this property, with this lease on it, and at the time the lease was made, it was made at the going rentals for the properties of that type. * * *

"Q. You heard the statements of estimates of land and building values given by Mr. Saint and Mr. Puffer, in which they testified to a certain value of the land and the building and an additional value due to the favorable lease. Do you remember that? A. Yes, sir.

Court may arrive at the conclusion that the 1938 market value of the land would itself sufficiently reflect the present worth of the rentals normally to be expected to be obtainable from the land itself, by way of ground rents. Or, to put it another way, the possible prospective purchasers, whose opinions would have much to do with establishing . market value, would no doubt arrive at those opinions by capitalizing the possible rentals. Should this be found to be a conclusion justified by the facts, the "premium", or sum representing the favorable features of the lease might be found to be the difference between the value of the land and the capitalized value of the rents reasonably to be expected under the lease.[16]

▉ Again the intangible property which we here consider must be found to be subject to ultimate exhaustion, if depreciation or amortization is to be allowed. When physical property is involved, such as a building, we know of a certainty that time and the elements will ultimately wear it away. In the case of the expenses, and the demolition costs which taxpayer and her mother incurred in order to procure this lease, we know that such amounts are gone and will not be recovered. What we are here considering, as a possible item of property for depreciation, is not the lease, as such, but rather the favorable aspects or part of the lease. If the terms of the lease are such that it could be renewed at any time on the same terms, there will be no exhaustion, or wasting, or wear and tear, and no occasion for depreciation or amortization. This problem was noted in Milton H. Friend, 40 B.T.A. 768, where a similar deduction for exhaustion of an asserted favorable lease was denied. The Board said, "There is no showing that the rental value of premises at the expiration of the leases will be any less than it was upon the dates of the execution of the leases." Some of the witnesses who testified as to the "favorable" character of the leases, as of 1938, attributed the falling off of rentals since the lease was made, to the movement of merchandising business away from downtown Los Angeles, and out into other sections of the city where trading centers had sprung up, where more room was available for parking facilities and where other types of store buildings could be erected. Here the business and merchandising trends to which the lessened rental market as of 1938 was attributed, might or might not be found to represent a permanent trend, evidencing exhaustion of the intangible value here involved, by the time the lease, or its period of "favorable" rents, comes to an end.

If we were the Tax Court we could proceed to put these difficulties of proof to the test by permitting the taxpayer, and the Commissioner, to submit such proof as they were able to adduce. If the taxpayer were unable to sustain her burden of proof as to what deductions she should be allowed, the judgment required would be plain. But since we are not the triers of the facts, we must drop these questions into the lap of the Tax Court. Possibly the Tax Court may be warranted in determining that there has been a failure of proof. On the other

---

"Q. Do you have an opinion as to whether or not there is any additional value attributable to that property due to the lease? A. I have an opinion, yes, sir.

"Q. What is your opinion? A. That there is no separate value. In my opinion, the value of that property is entirely in the ground, the owner of the fee, and that value is based upon the land and the improvement. That lease, at the time it was made, was the going rate. In other words, at no time, in my opinion, has that lease ever had a bonus value."

16. In determining the "rents reasonably to be expected under the lease" the possibility of an end of them in 1960 would properly be considered. See Footnote 13a, supra. We discuss these problems of proof, not for the purpose of giving any directions as to how the Tax Court should deal with the facts, which are exclusively for its determination, but merely for the purpose of inquiry as to whether as a matter of law, proof is possible.

hand, it may find that although some speculation is involved, nevertheless some amount may be properly allocated as the value of that portion of the lease which represents its favorable features, or which is attributable to the excess of the actual rentals over those obtainable on a 1938 letting. That such allocations are somewhat speculative does not prevent their being made. Davison v. Commissioner, 2 Cir., 60 F.2d 50. Cf. Commissioner of Internal Revenue v. Swenson, 5 Cir., 56 F.2d 544, 547; Collin v. Commissioner, 6 Cir., 32 F.2d 753; Conrad & Co. v. Commissioner, 1 Cir., 50 F.2d 576, 579. As stated in Bryant v. Commissioner, 2 Cir., 76 F.2d 103, 105: "In such cases though it be impossible to reach a certain conclusion, it has been several times held that the Board should exercise a sound judgment, though taking all chances against the taxpayer. * * * We are quite aware that the result will be speculative, but the Treasury will be protected and some relief is juster than the denial of all."

The decisions and orders of the Tax Court are reversed and the cause is remanded for further proceedings not inconsistent with this opinion.