Marvin M. May and Lorraine May v. Commissioner.
May v. Commissioner
Docket Nos. 2255-66, 2256-66, 2257-66, 1718-67.
United States Tax Court
T.C. Memo 1972-70; 1972 Tax Ct. Memo LEXIS 186; 31 T.C.M. (CCH) 279; T.C.M. (RIA) 72070; March 22, 1972, Filed *186 T entered into an arrangement in which he purported to purchase 13 television film episodes for an alleged purchase price of $365,000. His out-of-pocket costs were $35,000 and it was never intended that he pay any more, notwithstanding that he was theoretically obligated to pay the entire purchase price. He attempted to take depreciation deductions aggregating $365,000 over a two-year period. Held, in the circumstances of this case, this was not a bona fide purchase, and T was not entitled to the claimed deductions. Sidney J. Matzner, 9465 Wilshire Blvd., Beverly Hills, Calif., for the petitioners. J. Earl Gardner, for the respondent. 280 RAUM
Memorandum *187 Findings of Fact and Opinion The Commissioner determined the following deficiencies in petitioners' income tax: Calendar Year
Deficiency
1959
$80,205.03
1960
59,645.27
1961
76,006.88
1964
380.69 The only question presented for decision is whether petitioner Marvin M. May had a depreciable interest in 13 episodes of a television film series. The Commissioner disallowed depreciation deductions in respect thereof for 1959 and 1960. All other matters in controversy in controversy [1] depend upon the answer to the foregoing question, and will be disposed of accordingly in the decisions to be entered under Rule 50. Findings of Fact The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. Petitioners Marvin M. May and Lorraine May are husband and wife. They filed joint Federal income tax returns for the calendar years 1959, 1960, 1961 and 1964 with the district director of internal revenue at Los Angeles, California, and *188 resided at 2244 North Edgemont Street, Los Angeles, California, at the time their petitioners herein were filed. At all times here pertinent, Marvin M. May ("May" or "petitioner") was president and a substantial stockholder of Tubular Structures Corporation of America, a construction equipment business. His net worth in late 1958 and early 1959 was between $300,000 and $400,000, and the taxable net income disclosed on his joint returns for 1959 and 1960 was in excess of $136,000 and $113,000, respectively, computed without taking into account the depreciation and related items here in controversy. He was not engaged in the television or entertainment industry, nor does he appear to have had any expertise, training, or special knowledge or skills in such fields. During the years in issue and until the time of the trial herein petitioner's accountant was a person named Temkin. In 1958 Temkin was associated in the practice of accountancy with the firm of Beidner, Temkin & Ziskin, C.P.A.'s. Sometime prior to November 20, 1958, Temkin introduced petitioner to George Beidner ("Beidner"), who was a partner in the same accounting firm. One of Beidner's clients, Robert B. Raisbeck ("Raisbeck"), *189 and, through him, Beidner and the accounting firm were interested in a venture involving the production of a television-adventure film series, entitled "Lee Green's Rendezvous With Adventure" (sometimes referred to as the "series" or "film series"). The venture was being carried out by two entities, a California partnership known as Sjambok Productions ("Sjambok"), and a Bahamian corporation, Lee Green Stock Footage, Ltd. ("Stock Footage"). Sjambok, which was formed July 14, 1958, was composed of Raisbeck and Leland W. Green ("Green"), each of whom had a 50 percent interest therein. Green was a cinema photographer and Raisbeck a T.V. producer. Green and Raisbeck each owned 45 percent of the outstanding stock in Stock Footage and the accounting firm owned the remaining 10 percent. Sjambok as well as Raisbeck was a client of the accounting firm. In general Stock Footage photographed the episodes and sold the raw footage to Sjambok, which edited the film, provided soundtrack, titles, etc. The ultimate product was to be exploited through an agent who was to arrange for showings by various television stations, a process referred to as "syndication". In the late 1950's there was a lucrative *190 market for travel-adventure film series among television stations in the western part of the United States. Such film series also had certain appeal on east coast and national television. Series of this nature that had previously been successfully syndicated to local television stations usually consisted of 39 separate episodes, which allowed for approximately nine months of first-run programming and 13 weeks of selected re-runs to fill out a year of weekly broadcasts of the series. Another feature of successful travel adventure series was their verisimilitude or authenticity. Most of the series did not employ actors but rather depicted "actual" people in the traveladventure context. In 1957 or 1958 Raisbeck and Green, on the basis of two pilot films, were able to 281 obtain approximately $90,000 in contractual commitments from various stations in the western part of the United States for broadcast rights to 13 half-hour episodes of a travel-adventure series. These initial contractual agreements were negotiated by Tom Corradine ("Corradine"), a syndicated film distributor to television, on behalf of Raisbeck and Green. With this $90,000 in commitments, Raisbeck and Green entered *191 into the Sjambok partnership, and Stock Footage was formed at approximately the same time. The arrangement between Sjambok and Stock Footage was reflected in an agreement between them dated December 22, 1958, whereby Stock Footage was to produce 36 "varied adventure subjects" (i.e., "Lee Green's Rendezvous With Adventure") and sell the "raw film" or stock footage of the series to Sjambok for $22,500 per episode. Sjambok, for its part, agreed to "process, edit, dub, score and create the narrative tract" for each of the programs. In respect of the distribution rights of the series, the agreement provided as follows: 7. Upon the payment to * * * for each such film subject as hereinbefore provided Sjambok shall have the sole right to exhibit and distribute the processed and edited film within the United States of America and its Territories and Possessions provided that Sjambok shall deliver to * * * at no further cost to * * * such fully commercial prints of the same (not being more than one-dozen) as * * * may require and * * * shall have the sole right to exhibit and distribute the said film throughout the rest of the world. Despite the $90,000 in commitments for the broadcast rights *192 to the first 13 episodes of the series negotiated by Corradine, the Sjambok partnership experienced some difficulties in raising the financing required for these first segments of the series. On or about July 31, 1958, Sjambok obtained a loan from Pacific Thrift and Loan ("Pacific") in an amount not exceeding $50,000. The loan was obtained with the assistance of Beidner, who was an officer of Pacific. In respect of the loan Pacific took Raisbeck and Green's personal note or notes which were secured by a chattel mortgage on the first 13 episodes of the film series. The terms of the loan also provided that Sjambok assign to Pacific all interest in certain exhibition contracts held by Sjambok on the first 13 episodes of the series, apparently as means of repaying the loan. This additional financing enabled Sjambok and Stock Footage to produce the first 13 episodes of "Lee Green's Rendezvous with Adventure". By the time these episodes were completed Sjambok had entered into a tentative agreement with MCA TV, Ltd. ("MCA TV") for national distribution of the entire series. However, MCA TV was concerned about Sjambok's ability to finance further episodes of the series and to produce a total *193 number of 39 programs (or at least 26), in conformity with industry practice; and, ultimately MCA TV decided not to distribute the series. Thereafter, at a time not disclosed by the record, Sjambok entered into a distribution agreement with Flamingo Telefilm Sales, Inc. ("Flamingo"), for the syndication of the "Lee Green's Rendezvous With Adventure" series in the United States. Under a separate agreement with Stock Footage, Flamingo was also given exclusive rights to distribute and otherwise exploit 39 episodes of the film series throughout the remainder of the world. Unlike MCA TV, Flamingo does not appear to have been one of the more important distributors of television films. During the production of the second 13 episodes of "Lee Green's Rendezvous With Adventure", Sjambok and Stock Footage again experienced financial difficulties. The series was substantially more expensive to produce per episode than comparable traveladventure programs in part because, unlike similar series, actors were used to perform roles suggesting the travel and adventure motif. The 26 episodes of "Lee Green's Rendezvous With Adventure" which were eventually completed cost an average of approximately $30,000 *194 each. Other similar series, but of superior quality, were produced at about this time by others for approximately $5,500 - $11,500 per episode. Petitioner's connection with the television series grew out of his relationship with the accounting firm, and particularly with Beidner. As noted above, petitioner had no previous experience in the television industry. On November 20, 1958, after the first 13 episodes had been completed, but while difficulties were being encountered in obtaining financing to produce the second 13 episodes, petitioner entered into a "Loan and Security Agreement" pursuant to which he "loaned" $35,000 to Sjambok. He received a note in the face amount of $35,000, payable on or before 282 January 20, 1959, and signed on Sjambok's behalf by Raisbeck and Green. The note was secured by a chattel mortgage on the first 13 episodes. By the terms of the "Loan and Security Agreement" and the chattel mortgage petitioner's rights were subject to Sjambok's prior agreements with Pacific Thrift and Loan previously described. Also on November 20, 1958, and at the same time the above documents in respect of petitioner's loan to the partnership were executed, Sjambok and *195 petitioner entered into an option agreement under which petitioner was granted an irrevocable option purportedly to purchase the partnership's right, title and interest in the first 13 episodes of "Lee Green's Rendezvous With Adventure" for $365,000. The option agreement provided in part as follows: In consideration of said loan and the sum of $1.00, receipt whereof is hereby acknowledged, we hereby grant you the irrevocable right and option to purchase from us all of our right, title and interest in and to the thirteen episodes now completed in the television series entitled "RENDEZVOUS WITH ADVENTURE" for the sum of $365,000.00 payable as follows: (a) Cash concurrently with the execution of the sale documents - $35,000.00; (b) A sum not to exceed $50,000.00 payable to Pacific Thrift and Loan, which payment is secured by a first mortgage on said television films; (c) The sum of $165,000.00 payable to Lee Green Stock Footage, Ltd., which payment is secured by a mortgage subordinate to that of Pacific Thrift and Loan hereinabove referred to; (d) The balance to be payable to us, secured by a mortgage subordinate to the two mortgages hereinabove referred to. You understand *196 and agree that aside from the sums payable in accordance with Paragraphs (b) through (d) inclusive hereinabove, and the mortgages given to secure the payment of such sums, you are purchasing said thirteen (13) television films subject to that certain agreement between the undersigned and Pacific Thrift and Loan, dated July 31, 1958, as the same has been amended, a copy whereof has been furnished to you and you are also purchasing said films subject to the rights of distribution of MCA TV, Ltd. or some other distributor to distribute the entire series, including the episodes to be sold to you with the right thereunder to receive certain distribution fees and reimbursement for certain costs and expenses of distribution. * * * We further acknowledge that your investment in said thirteen episodes will be seriously jeopardized in the event we do not complete at lease thirty-nine (30) episodes in said television series and we therefore agree and acknowledge that you are acting on reliance on our promise to cause to be produced in time to meet any present or future exhibition commitments at least twentysix additional episodes in said television series. Petitioner purported to exercise *197 his rights under the option agreement by a letter to Sjambok dated January 20, 1959. Thereafter, petitioner for income tax purposes treated January 20, 1959, as the date he acquired his alleged ownership interest in the first 13 episodes of the film series. However, it was not until around August 5, 1959, that petitioner executed a purported sales agreement with Sjambok in respect of the 13 episodes, and Sjambok notified Film Service Laboratories, Inc., which apparently processed the films, of the purported purchase. This agreement was not introduced into evidence, but the record contains no evidence to show that its terms differed in any material respect from those in the option agreement dated November 20, 1958, which was entered into by petitioner and Sjambok. Under these terms petitioner returned Raisbeck and Green's note in the amount of $35,000, which he had received in respect of his November 20, 1958, loan to the partnership, and released the chattel mortgage he held securing that loan. He also allegedly personally obligated himself to pay an additional $330,000, as outlined in the option agreement. Petitioner's obligation to pay this additional $330,000 was secured by a chattel *198 mortgage on the 13 episodes petitioner allegedly purchased. The books and records of the Sjambok partnership reflected the purported sale of the first 13 episodes of the film series accordingly. Prior to his purported exercise of the option on January 20, 1959, petitioner made at most only a casual investigation as to the soundness of his commitment to pay $330,000 in addition to the original down payment of $35,000 for the 13 episodes. Apart from discussing the matter with Beidner and Raisbeck, he visited Corradine's office. While there he examined certain receipts pertaining to the film series, but he never 283 did meet with Corradine. The series was in fact of poor quality, and Corradine's professional opinion as early as January 1, 1959, was that "Lee Green's Rendezvous With Adventure" would not be a successful series. Corradine's judgment in this respect was based at least in part on Sjambok's inability to deliver the requisite number of first-run episodes of the film series, and the poor quality of the episodes which had already been produced. His opinion was shared by other members of the television industry familiar with traveladventure programming. Although petitioner *199 did not have any previous experience or expertise in television film production, as already noted, he did not otherwise consult any experts or appraisers or engage legal counsel on his behalf in connection with his decision allegedly to purchase the first 13 episodes. At the time he purportedly purchased the 13 film episodes petitioner did not contemplate ever being out of pocket more than the $35,000 he had originally advanced to Sjambok and which was later applied to the purported purchase price of the films. He merely assumed that the syndication of the series would result in sufficient revenue to "discharge" his purported obligation under the alleged sales agreement. And although syndication of the series did not in fact prove successful, as described hereinafter, petitioner was never required to pay any amount in addition to the initial $35,000, nor does the evidence disclose that any steps were ever taken even to demand or request that he pay the remaining amount due on the purchase price which he purportedly had obligated himself to pay. Also, subsequent to his purchase of the 13 episodes of "Lee Green's Rendezvous With Adventure" petitioner never received any information *200 or accountings in respect of the earnings, expenses or losses of the film series. He relied upon the firm of Beidner, Temkin & Ziskin to apply whatever earnings there were to the payment of his obligations under the purported sales agreement, and these earnings were reflected on his income tax returns that the firm prepared for him. He took no affirmative action, aside from consulting with members of the Beidner, Temkin & Ziskin accounting firm in respect of his alleged interest in the 13 film episodes. The film series itself was not successful. Only 26 episodes were finally produced. Because of the relative unattractiveness of series of less than 39 segments to television stations, the poor technical quality of the completed episodes, and the series' lack of authenticity in its use of actors, syndication of "Lee Green's Rendezvous With Adventure" did not produce adequate revenues. Over the three-year period 1959 through 1961, "Lee Green's Rendezvous With Adventure" earned net income or suffered losses in the amounts as follows: Share attributable
to petitioner's pur-
ported interest
1959
$58,260.57
$29,130.29
1960
25,498.80
12,749.25
1961
(4,044.74) (Loss)
(2,022.37) (Loss)
*201 Petitioner's alleged pro rata share of the income and losses was applied to his purported indebtedness of $330,000, as described hereinafter. Because of the failure of the series to produce sufficient earnings, Sjambok borrowed repeatedly from Pacific during 1958 and 1959. And eventually, Sjambok assigned all of the partnership's rights under the purported sales agreement with petitioner to Pacific. In this manner Pacific acquired full "fiscal control" over the film series by 1961. In October, 1961, Pacific foreclosed its first mortgage on all 26 episodes of "Lee Green's Rendezvous With Adventure", and acquired full title to the 26 episodes in the sale of the film series pursuant to the foreclosure. Although the petitioner had assumed certain of Sjambok's indebtedness to Pacific under the purported sales agreement in respect of the first 13 episodes of the film series, as disclosed hereinabove, and although Sjambok assigned to Pacific all of the partnership's interest in that agreement sometime before the foreclosure proceedings, petitioner was not notified of these proceedings, or made a party to them or any other proceedings in respect of his purported indebtedness arising out *202 of his agreements with Sjambok. At the time of the foreclosure, petitioner was still allegedly indebted in the amount of $290,142.83 on his agreement to purportedly purchase the first 13 episodes. This amount of $290,142.83 represented his initial liability of $365,000, less the $35,000 credit against the purchase price for the November 20, 1958, loan, and less his 50 percent pro rata net share of income and losses from the 26 episode film series in 1959, 1960, 1961, which was applied to his indebtedness in connection with the various mortgages of the 13 episodes. Such indebtedness in respect to each mortgage as of October, 1961, was as follows: 284 Pacific's First Mortgage
$ 26,500.00
Stock Footage's Second Mortgage
165,000.00
Sjambok's Third Mortgage 98,642.83
$290,142.83
On their 1959 tax return the Mays claimed a depreciation deduction in respect of the 13 film episodes allegedly purchased by petitioner for $365,000 on January 20, 1959. They estimated the useful life of the films at 3 1/2 years and employed the declining balance method of computing the deduction at a rate of 150 percent of the straight line method. The deduction claimed in 1959 amounted *203 to $143,392.92. On their 1960 tax return, petitioners reduced the estimated useful life of the films to 1 1/2 years and, employing the same method of computation, claimed a deduction in the amount of $221,607.08. On their 1959 and 1960 tax returns the Mays also reported income from petitioner's purported interest in the 13 episodes of the film series in the respective amounts of $15,750 and $14,511.83. And they claimed deductions of $2,362.50 and $2,176.77, respectively, on these returns for commissions paid in connection with the distribution of the television film series. The Mays' 1961 tax return did not make any reference to the 13 film episodes, or reflect in any manner the tax treatment of the $290,142.83 in alleged indebtedness of which petitioner was relieved as a consequence of Pacific's foreclosure purchase of the film series in that year and its failure to take any action against petitioner. In his deficiency notice the Commissioner determined that the Mays were not entitled to the depreciation deductions claimed by them in 1959 and 1960 in respect of the 13 episodes of "Lee Green's Rendezvous With Adventure". The Commissioner further determined that petitioners did *204 not receive any taxable income from the television series as reported on their 1959 and 1960 returns, and reduced the Mays' taxable income accordingly in the respective amounts of $15,750 and $14,511.83. Also, the Commissioner disallowed the commission deductions claimed on the 1959 and 1960 returns in connection with the film series. The Commissioner, in order to protect the revenue, has also made alternative determinations. In his answer to the petitions herein in respect of the years 1959 and 1960, the Commissioner has determined that petitioner received unreported taxable income in connection with his "interest" in the 13 film episodes in the respective amounts of $26,890.75 and $4,418.17. Similarly, the Commissioner has determined that petitioner realized long-term capital gain in 1961 in the amount of $290,142.83 when the film series was sold pursuant to Pacific's foreclosure of its first mortgage and petitioner's liability in that amount was extinguished. The Commissioner does not press the determinations referred to in this paragraph if he should be successful in his principal determination that petitioner had no depreciable interest in the television series. Opinion *205 RAUM, Judge: The issue for decision is whether petitioner possessed a "depreciable interest" in the first 13 episodes of "Lee Green's Rendezvous With Adventure" in respect of which the Mays claimed the deductions here in issue. Section 167(a), I.R.C. 1954, authorizes as a deduction a "reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)" of property used in a taxpayer's trade or business or held by him for the production of income. Petitioner has the burden of proving that he had such an interest in the films which was subject to economic loss through deterioration or exhaustion. LeBelle Michaelis, 54 T.C. 1175, 1178. Catharine B. Currier, 51 T.C. 488, 492. Cf. Commissioner v. Moore, 207 F. 2d 265, 168, 269 (C.A. 9), certiorari denied 347 U.S. 942, reversing 15 T.C. 906. As we view the record, we agree with the Government's contention that the transaction before us was a sham. We are satisfied on the evidence that petitioner never in fact became the owner of the 13 films, that he never intended to pay any purchase price of $365,000 although obligated on paper *206 to do so, and that the owners of the films never intended to require him to pay any such purchase price. Although the transaction was dressed up to look like a sale on the basis of which petitioner might claim $365,000 depreciation deductions, all that really occurred here was petitioner's payment of $35,000 for a facade to enable him to claim such deductions. He did not in fact have any bona fide proprietary interest in the films. In short, he merely entered into a "technically elegant arrangement" ( Griffiths v. Commissioner, 308 U.S. 355, 357), whereby he attempted 285 to acquire the large depreciation deductions in exchange for a payment of $35,000. Throughout the period when petitioner, a corporate executive and man of substantial means, allegedly became interested in, purchased and owned the 13 film episodes, he had little, if any knowledge concerning the financial situation of the television series, the earnings and losses related to his "interest" therein, or the status of his purported liability of $330,000 arising from the so-called purchase of the 13 films. Such information was supposedly kept for him by the Beidner, Temkin & Ziskin accounting firm, which *207 also acted as accountants for Raisbeck and the Sjambok partnership. Indeed, it was through Beidner, a partner in the accounting firm that petitioner met Raisbeck and became interested in the transaction here in issue. Although petitioner, an obviously successful and astute businessman, was completely inexperienced in the television field, he did not engage legal counsel or consult any experts or appraisers in reaching his decision to "purchase" the films and purportedly obligate himself to pay a total of $365,000 - a liability that could wipe out his entire net worth. He did visit the office of Tom Corradine, a distributor of the film series, but he never spoke personally with Corradine, whose professional judgment it was that "Lee Green's Rendezvous With Adventure" would not be a financial success. After he executed the agreement by which he purportedly purchased the 13 film episodes, petitioner never received any reports or accountings in respect of the earnings, expenses, and losses on his alleged interest, and never took any affirmative action to obtain such information. Moreover, when Pacific, with which Beidner was also connected, finally foreclosed its first mortgage, petitioner *208 was not notified of or made a party to the proceedings despite the fact that he was allegedly personally obligated to Pacific. In the circumstances, it would overtax the imagination to believe petitioner would act so casually as to the purchase and so passively as to the ownership of a bona fide investment which placed his entire net worth in jeopardy. [2] The answer, of course, is that he had no such investment in the 13 episodes of "Lee Green's Rendezvous With Adventure". It was never contemplated that he would "invest" more than the initial $35,000, which was paid to purchase tax deductions, not depreciable property. The whole transaction was never intended to achieve an arm's-length sale and purchase of the 13 film episodes, but rather an advantageous tax situation. The Commissioner's disallowance of the claimed deductions must be approved. Cf. W. H. Armston, 188 F. 2d 531, 533-534 (C.A. 5), affirming 12 T.C. 539. See Irvine K. Furman, 45 T.C. 360, 364-366, affirmed per curiam 381 F. 2d 22. *209 It is equally inconceivable to us that petitioner could have reasonably contemplated holding the 13 films for "profit" within the meaning of section 167(a)(2). It was anticipated by professionals in the television industry that the series would not be a financial success both because of its poor technical quality and the inability of Sjambok and Stock Footage to produce a full complement of 39 separate episodes. Corradine had reached this conclusion as early as January 1, 1959. Petitioner was a businessman and corporate executive. The record fails to show that this information was not readily available to him. We can only conclude that the profitability of an investment in the 13 episodes was of little import to him. Cf. Samuel Yanow, 44 T.C. 444, 452-453, affirmed per curiam 358 F. 2d 743 (C.A. 3). Decision will be entered under Rule 50. 286 Footnotes
1. The parties have stipulated as to the resolution of certain other determinations made by the Commissioner which are unrelated to the television film series.↩
2. An additional factor indicative of the casual attitude towards the transaction casting further doubt upon its bona fides is the long and unsatisfactorily explained gap between January 20, 1959, when petitioner purported to exercise his option to purchase the 13 episodes, and August 5, 1959, when the operative document transferring title was executed. Indeed, neither that document nor any copy thereof was presented in evidence and the evidence even fails to show that petitioner ever kept any such document or copy among his records. Surely, if the transaction were bona fide and if petitioner had obligated himself to pay an amount that was approximately equal to his rather considerable net worth, he would have been careful to have obtained custody of the critical documents and not merely leave them in the hands of those charged with the responsibility of preparing his income tax returns.↩