MIDLER COURT REALTY, INC., PETITIONER v. COMMISSIONER OF
INTERNAL REVENUE, RESPONDENT

Docket Nos. 1989–68, 3023–68, 5751–71.   Filed January 31, 1974.

*Benjamin Alpert*, *Myles J. Sachs*, and *Gerald W. Keil*, for the
petitioner.

*John J. O'Toole* and *Gerald Backer*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in the cor-
porate income taxes due from petitioner and its subsidiaries, as follows:

| Docket No. | Year | Amount |
|---|---|---|
| 1989–68 | 1962 | $186, 427. 88 |
| | 1963 | 270, 795. 86 |
| | 1964 | 289, 878. 50 |
| 3023–68 | 1965 | 277, 890. 40 |
| | 1966 | 310, 587. 04 |
| 5751–71 | 1967 | 234, 139. 00 |
| | 1968 | 99, 813. 00 |

The deficiency for the taxable year 1967 is an increased deficiency
over the amount of $228,649 asserted in the statutory notice, claimed by
the respondent in an amended answer with respect to which petitioner
has stipulated to the facts pleaded therein.

As a result of concessions made by the parties, the questions remain-
ing for decision relate to the following:

(1) Whether any part of the purchase price paid by petitioner for
the properties under lease to General Electric may be amortized over

the initial terms of the leases on account of the so-called excess rentals provided for therein; and,

(2) The remaining useful lives of the buildings leased to the General Electric Co. and of the buildings leased to other tenants for purposes of determining a reasonable allowance for depreciation under section 167 for the taxable years 1962 to 1968, inclusive.[1]

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits are incorporated herein by this reference.

The petitioner is a corporation duly organized and existing under the laws of the State of New York, with its principal office at the time of the filing of the petitions at Newark, N.J. It is the common parent of three wholly owned subsidiary corporations, Midler Land Development, Inc., New York State Investors, Inc., and Frel Properties, Inc., with which it filed consolidated returns for the short period ended December 31, 1961, and the calendar years 1962 through 1968, inclusive, with the district director of internal revenue, Newark, N.J. Each of these corporations were engaged in the ownership and leasing of commercial real estate and are hereinafter collectively referred to as "petitioners."

On November 30, 1961, petitioners acquired by purchase 19 buildings located in the Syracuse Industrial Park in the Town of De Witt, near Syracuse, N.Y., for a total cost of $11,983,661, of which the sum of $658, 661 was allocated as the cost of the land, and the balance represented the cost of the buildings and other depreciable improvements. The amount allocated to the cost of the General Electric buildings was $10,191,525, of which $496,525 was for the land, and the balance of $9,695,000 was for the buildings and improvements. The amount allocated to the cost of the 9 buildings leased to other tenants was $1,777,-342, of which $147,342 was for the land, and $1,630,000 was for buildings and improvements.

The buildings acquired by petitioners had been constructed during the years 1954 to 1960, inclusive, to be used as warehouses, manufacturing and office facilities, or combinations thereof. For the most part, the buildings were single-story masonry and steel construction with tilt-up precast concrete sidewalls with bar joist construction and metal decks with tar and gravel built-up roofs. Two of the buildings had concrete block sidewalls with the same roof construction. With the possible exception of the office building leased to General Electric Co., the buildings were general purpose buildings suitable in some cases either

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

for warehouse or light manufacturing use and in other cases for warehouse and heavy manufacturing.

The Syracuse Industrial Park was located approximate to an exit of the New York State Thruway and adjacent to the main line of the New York Central Railroad near the airport serving the City of Syracuse.

On November 30, 1961, when the properties were acquired by the petitioners, the 19 buildings were under lease to various tenants. The following schedule sets forth the floor area and stipulated cost of each property (including the land), together with the basic terms of the lease applicable thereto:

| Buildings | Footage (square feet) | Cost | Starting date | Primary term | |
|---|---|---|---|---|---|
| | | | | Term (years) | Annual rental |
| G.E. No. 1 | 42,000 | $396,263 | Dec. 6, 1954 | 10 | $78,000 |
| G.E. No. 2 | 62,000 | 370,903 | Dec. 6, 1954 | 10 | 57,000 |
| G.E. No. 3 | 69,000 | 905,692 | Dec. 5, 1955 | 10 | 156,400 |
| G.E. No. 4 | 75,000 | 1,432,605 | Oct. 31, 1956 | 10 | 171,190 |
| G. E. No. 5 | 256,000 | 4,346,813 | June 30, 1957 | 10 | 588,800 |
| G.E. No. 5A | 83,200 | 602,658 | Oct. 1, 1958 | 8¾ | 57,000 |
| G.E. No. 6-7 | 100,000 | 612,658 | Dec. 1, 1958 | 2 | 75,000 |
| G.E. No. 8 | 28,000 | 374,341 | Nov. 1, 1958 | 10 | 66,000 |
| G.E. No. 9 | 60,000 | 1,149,592 | May 31, 1960 | 10 | 144,000 |
| Pepsi-Cola No. 10 | 36,000 | 273,670 | Apr. 1, 1956 | 20 | 25,200 |
| Onondaga No. 11 | 30,720 | 218,760 | Dec. 1, 1956 | 20 | 17,203 |
| Crossman No. 12 | 24,000 | 192,189 | July 1, 1958 | 15 | 13,200 |
| Grainger No. 13 | 4,000 | 27,457 | Jan. 1, 1959 | 25 | 3,600 |
| Whitehead No. 14 | 45,000 | 386,368 | May 1, 1959 | 25 | 30,000 |
| Graybar No. 15 | 30,000 | 218,760 | ............ | 20 | 18,000 |
| Canteen No. 16 | 10,530 | 81,954 | Aug. 1, 1958 | 20 | 9,600 |
| Nichols Thompson No. 17 | {14,000 / 14,070 | 218,760 / 218,760 | Dec. 1, 1957 / June 1, 1954 | 15 / 7 | 12,693 / 9,000 |
| Materials Handling No. 18 | 15,260 | 142,000 | Feb. 1, 1961 | 20 | 18,600 |

| | First renewal | | Additional renewals | | Primary term plus renewals (years) |
|---|---|---|---|---|---|
| | Term (years) | Annual rental | Term (years) | Annual rentals | |
| G.E. No. 1 | 2 | $78,000 | 3×5 | $32,000 | 27 |
| G.E. No. 2 | 2 | 57,000 | {1×5 / 2×5 | 32,000 / 30,000} | 27 |
| G.E. No. 3 | 2 | 156,400 | 3×5 | 57,720 | 27 |
| G.E. No. 4 | 2 | 171,190 | 3×5 | 60,000 | 27 |
| G.E. No. 5 | 5 | 204,800 | 2×5 | 204,800 | 25 |
| G.E. No. 5A | 5 | 52,000 | 2×5 | 52,000 | 23¾ |
| G.E. No. 6-7 | 10 | 60,000 | 2×5 | 45,000 | 22 |
| G.E. No. 8 | 5 | 21,000 | 2×5 | 21,000 | 25 |
| G.E. No. 9 | 2 | 144,000 | 3×5 | 60,000 | 27 |
| Pepsi-Cola No. 10 | 5 | 15,000 | 2×5 | 15,000 | 35 |
| Onondaga No. 11 | 10 | 17,203 | ............ | | 30 |
| Crossman No. 12 | 5 | 13,200 | ............ | | 20 |
| Grainger No. 13 | | | | | 25 |
| Whitehead No. 14 | | | | | 25 |
| Graybar No. 15 | 5 | 12,000 | ............ | | 25 |
| Canteen No. 16 | 10 | 9,600 | ............ | | 30 |
| Nichols Thompson No. 17 | { ............ / 5 | ............ / 9,000 | ............ / 1×5 | ............ / 9,000 | 15 / 17 |
| Materials Handling No. 18 | | | | | 20 |

The initial development of the Syracuse Industrial Park was undertaken by a Mr. Stover, who was with Eagan Real Estate, Inc., an established firm in Syracuse, N.Y. In 1952, Mr. Stover learned that

General Electric Co. was interested in expanding its operations in the Syracuse area but did not have land available for such expansion. Mr. Stover thereupon enlisted as participants a Mr. Barrett of the Eagan firm and Messrs. Easter and Smith, contractors. A corporation was formed with Mr. Stover holding 40 percent of the stock and each of the others holding 20 percent of the stock. They thereupon acquired 115 acres of unimproved farmland for the purpose of developing the industrial park.

At the outset, General Electric's requirements comprised only two buildings to be used primarily for warehousing. Before these buildings could be completed, General Electric's requirements were expanded to include both offices and manufacturing space, requiring an additional cost of about $2 million. The needs of General Electric continued to expand resulting in the ultimate construction of approximately 775,200 square feet consisting of offices, manufacturing, warehousing, and laboratory space.

In addition, the developers proceeded with the construction of nine other buildings which were leased to various tenants. These additional buildings comprised a total area of approximately 223,580 square feet, ranging from 4,000 to 45,000 square feet per building.

In order to enable the developers to finance the erection of its buildings, General Electric from time to time entered into leases pursuant to which rentals would be established over a relatively short term at an amount sufficient to finance the cost of the buildings, following which General Electric reserved the right to renew at reduced rentals. In such leases, upon the expiration of the original term and a so-called 2-year "tail" or renewal, General Electric had the option thereafter to renew the leases at rentals which were "below market" for comparable facilities. The developers set these renewal rentals at an amount which, in their minds, would make it most attractive for General Electric to renew.

Due to the utilization of accelerated methods of depreciation, the developers realized that by the year 1963 the depreciable costs of the development would have largely been recovered through depreciation, and the net cash flow from rentals would be inadequate to amortize the indebtedness on the property. The developers thereupon unsuccessfully sought additional financing. In the meanwhile, the other participants had also contracted to purchase the interest held by Mr. Stover. In order to meet such obligations, they thereupon offered the property for sale.

Mr. Leo T. Eagan of Eagan Real Estate, Inc., acted as broker for the sellers. After unsuccessful efforts to sell the buildings at higher prices, the sellers offered the buildings for a price computed by them by adding some $4 million to the unpaid balance of the mortgage

indebtedness. Certain of Mr. Eagan's family, acting through the petitioners, thereupon agreed to purchase the properties at that price. In order to complete the purchase, petitioners obtained additional financing of some $5,500,000 for a term of 23 years.

There were no negotiations or discussions concerning a separate price attributable to, and paid for the General Electric leases, as part of the total purchase price.

The petitioners filed a consolidated U.S. corporation income tax return for the taxable period ended December 31, 1961. In said return, and in the returns filed for subsequent taxable years, the petitioners determined that the average useful life of the 19 buildings and improvements was 15 years from the date of acquisition of the property by the petitioners. Petitioners elected to claim depreciation on said properties on the basis of a 15-year life and the "declining balance" method.

In the statutory notices of deficiency, respondent determined petitioners' allowable depreciation deductions in the years in issue (using the "declining balance" method) by employing an average useful life of 40 years at date of acquisition of the 19 buildings rather than the 15 years utilized by petitioners in its returns.

In amended petitions filed after the trial with the permission of the Court given at trial, petitioners contend that a portion of the total purchase price paid for the 10 buildings leased to General Electric should be allocated to the right to receive "excess"rentals from General Electric during the original term and 2-year "tails" in those leases, which amount should be amortized over a period consisting of the remaining term at November 30, 1961, of the initial General Electric leases and, where applicable, the 2-year "tail." Petitioners further allege that with respect to the remaining portion of the purchase price of the said 10 buildings that such sum be depreciated as the cost of these buildings over useful lives equal to the unexpended portion of the initial term, plus the first 2-year renewal, if applicable, and two succeeding 5-year optional renewal terms.

In the amended petitions with respect to the remaining nine buildings not leased to tenants other than General Electric, the petitioners claimed useful lives for said buildings of not more than 33⅓ years from the date of construction.

OPINION

The petitioners acquired a complex of buildings located in the Syracuse Industrial Park, all of which were under lease, for a total consideration of $11,983,661. Of this amount, it is agreed that the sum of $10,191,525 represented the cost of the properties leased to

General Electric, of which $496,525 is allocable to the land, and the balance of $9,695,000 is allocable to the buildings and improvements. The balance of the purchase price amounting to $1,777,342 was allocated to the cost of the other nine buildings, of which $147,342 represented the cost of the land, and $1,630,000 represented the cost of buildings and improvements.

In its first return for the taxable period ended December 31, 1961, the petitioners adopted the declining-balance method of depreciation and attributed a useful life of 15 years to all of the buildings and improvements. The petitioners have since modified their position. The petitioners now claim that for purposes of depreciation a part of the cost of the properties leased to General Electric should be amortized over the term of the leases as a "premium" paid for the so-called excess rents to be received during that term. The petitioners would depreciate the remainder of the cost of these buildings over the primary term (including the 2-year "tail" where applicable) of the General Electric leases. With respect to the remaining properties, the petitioners now concede that the buildings had a useful life of 33⅓ years.

At the outset, the Court is thus called upon to decide whether the petitioners may allocate some part of the purchase price of the properties to the value attributable to the General Electric leases separate and apart from the interest in the fee. In effect, the petitioners would carve out an estate for a term of years, coterminous with the primary term of the General Electric leases, as a separate and distinct amortizable interest in the properties. Such argument not only runs counter to the basic concepts of the laws of real property but is incompatible with certain prior decisions of this Court.[2] *Milton H. Friend, et al., Trustees,* 40 B.T.A. 768 (1939), affd. 119 F. 2d 959 (C.A. 7, 1941); *Martha R. Peters,* 4 T.C. 1236 (1945); *Rosalie M. Shubert,* 33 T.C. 1048 (1960), affd. 286 F. 2d 573 (C.A. 4, 1961), certiorari denied 366 U.S. 960 (1961). We do not regard the decision in the *World Publishing Co.* v. *Commissioner,* 299 F. 2d 614 (C.A. 8, 1962), reversing 35 T.C. 7 (1960), as impinging in any way upon the cited cases.[3]

*Commissioner* v. *Moore,* 207 F. 2d 265 (C.A. 9, 1953), certiorari denied 347 U.S. 942 (1954), reversing and remanding the decision of this Court (15 T.C. 906), presented a situation where the taxpayer

---

[2] See 1 Tiffany, Law of Real Property, par. 151 (3d ed. 1939); 3 Tiffany, *supra,* par. 901.

[3] Rev. Rul. 73–410, 1973–2 C.B. 53, also relied on by the petitioners, is wholly irrelevant. That ruling merely states that a taxpayer purchasing land and a building may allocate, for purposes of depreciation, such cost separately to the various depreciable components of the building rather than adopt a composite rate for the building as a whole. The ruling does not recognize any right on the part of the taxpayer to segregate the purchase price as between a term of years represented by a favorable lease and the remaining useful life of the building.

had acquired by inheritance property subject to a 99-year lease. In substance, the appellate court held that if the taxpayer's basis for the property had been determined by reference to the value attributable thereto on account of the lease, as distinguished from the same property free and clear, the excess, if any, of such value over the residual value of the land should be amortized over the remaining term of the lease. Even were we to accept that principle, it would have no application to the facts of the case now before us.

The petitioners did not purchase the leases, as such. They purchased the fee, including both the right to receive rents during the respective terms of the various leases, as well as the right to possession upon the expiration of those leases. Until the trial of this case, there was no attempt to allocate any part of the cost to the leases per se as distinguished from the depreciable properties. Petitioners would now make such allocation by assuming a residual value after the initial term of the leases and attributing the difference between such residual value and the total cost as the premium paid for the favorable aspects of the leases.

The value of any property acquired subject to a lease may either be enhanced or diminished on account of the benefits or inhibitions resulting from the lease. If we look at the General Electric leases as a whole, what we have is a basic term plus renewals, with the rentals beginning at a relatively high level and, in the event of such renewals, declining to a relatively low level. As a whole, the leases may either have added to or detracted from the value of the property. The opinion of the experts differed.

The petitioners' basic claim relates to the depreciation of physical properties, i.e., buildings, and not to the amortization of an intangible right. The properties in question had a physical life well beyond the terms of the leases, including renewals. All the petitioners are really contending is that they should be allowed to deduct a greater amount of the depreciable cost during the initial terms of the leases in recognition of the fact that higher rentals are provided for that period. Section 167 both permits and prescribes the limitations of such deduction.[4]

---

[4] SEC. 167. DEPRECIATION.

(a) GENERAL RULE.—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

    (1) of property used in the trade or business, or

    (2) of property held for the production of income.

(b) USE OF CERTAIN METHODS AND RATES.—For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in subsection (a) shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary or his delegate, under any of the following methods:

    (1) the straight line method,

    (2) the declining balance method, using a rate not exceeding twice the rate which

The more liberalized depreciation rules embodied in section 167(b) were enacted as a part of the Internal Revenue Code of 1954 (H.R. 8300), in recognition of the fact that property generally contributes more to income in its early years of use than it does in the years immediately preceding its obsolescence (H. Rept. No. 1337, 83d Cong., 2d Sess., pp. 22–25; S. Rept. No. 1662, 83d Cong., 2d Sess., pp. 25–29). The report of the Committee on Ways and Means accompanying that Act thus states:

Interpretation of the word "reasonable" has given rise to considerable controversy between taxpayers and the Internal Revenue Service. The determination of useful life for a particular asset, or the average useful life for a group of similar assets, is a matter of judgment involving, in addition to physical wear and tear, technological and economic considerations. The method of allocating depreciation allowances to the years of use is also a matter of judgment. In many cases present allowances for depreciation are not in accord with economic reality, particularly when it is considered that adequate depreciation must take account of the factor of obsolescence. The average machine or automotive unit actually depreciates considerably more and contributes more to income in its early years of use than it does in the years immediately preceding its retirement. [H. Rept. No. 1337, 83d Cong., 2d Sess., p. 22.]

In their returns, petitioners elected to compute depreciation on these properties under the "declining balance" method provided in section 167(b)(2). A shift by the petitioners to some alternate method would be subject to the same limitations. Thus, section 167(b)(4) would foreclose the petitioners' claim with respect to the General Electric properties irrespective of any prior decisions by this Court.

With respect to the properties in question, the petitioners admit "to a *physical* life of forty years or more and that the buildings are not 'single' or 'special' purpose buildings as the terms are normally defined." Rather the petitioners argue that the economic life of the properties is limited because of the magnitude of the space leased to General Electric, for which it will be difficult to find another comparable tenant, and the limitations of the market in the Syracuse area.

With respect to the office building occupied by General Electric, the petitioners make further point that the land use (including parking) would not warrant the continued utilization of the site for that purpose beyond the tenancy of General Electric. See, for example, *Adda, Inc.*, 9 T.C. 199 (1947), affd. 171 F.2d 367 (C.A. 2, 1949).

would have been used had the annual allowance been computed under the method described in paragraph (1),

(3) the sum of the years-digits method, and

(4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in paragraph (2).

Nothing in this subsection shall be construed to limit or reduce an allowance otherwise allowable under subsection (a).

The initial terms and renewal periods of the leases covering the properties occupied by General Electric ran from terms of 22 years to 27 years. The last lease with General Electric covered a period of more than 30 years from its original occupancy in the Syracuse Industrial Park. Without engaging in abstract speculation as to the future, the length of such terms would indicate at least that General Electric had an interest in these properties over a period extending well beyond the initial term. Looking at the situation as it existed on November 30, 1961, the date of acquisition of these properties by the petitioners, General Electric had occupied building No. 9, representing a cost of $1,149,592, only some 18 months. As of that time, it could hardly be inferred that any change in plans was imminent.

Furthermore, with admittedly favorable leases covering the renewal terms, as one of the experts pointed out, General Electric would have every reason to hold on to the buildings and, if not needed in its business, to sublet rather than to relinquish its right of renewal. While it admittedly would be difficult to find a tenant or tenants for the entire 775,200 square feet occupied by General Electric at one time, there is no reason to suppose that General Electric would relinquish the entire complex at the same time. When we look 25 or 30 years into the future, the risks faced by the owners of these buildings is no greater from an economic standpoint than those faced by any owner of long-lived property. Such risks do not constitute tangible proof of economic obsolescence. See *Atlanta Biltmore Hotel Corp.* v. *Commissioner*, 349 F. 2d 677 (C.A. 5, 1965), and cases cited there.

Finally we reach the question whether the evidence in this case is sufficient to overcome the presumption of correctness attaching to the respondent's determination that the 19 buildings acquired by petitioners had a useful life of 40 years from the date of acquisition. Obviously, conditions might vary with respect to each particular building. For the most part, however, the parties have chosen to treat the properties as a whole for purposes of determining useful life. On the basis of the record before us, and taking into account the factor of obsolescence, it is our opinion that, as a group, the useful life of the 19 buildings acquired by the petitioners for the purpose of determining a reasonable depreciation allowance under section 167(a) and (b) was 33⅓ years from November 30, 1961.

*Decisions will be entered under Rule 155.*