**CONTINENTAL BANK**

v.

**UNITED STATES of America.**

Civ. A. No. 78–2527.

United States District Court,
E. D. Pennsylvania.

May 27, 1981.

David H. Pittinsky, Philadelphia, Pa., for plaintiff.

Francis G. Hertz, Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM AND ORDER

FULLAM, District Judge.

Section 103 of the Internal Revenue Code, 26 U.S.C. § 103, excludes from taxation as income, interest earned on obligations of states and municipalities; removes from this exemption interest earned on, *inter alia*, industrial development bonds; exempts from the latter exception certain "small issues" of industrial development bonds aggregating $1 million or less; and, finally, permits an increase of the amount of the "small issue" exemption to $5 million (now $10 million), under certain conditions. 26 U.S.C. § 103(b)(6)(D) (formerly § 103(c)(6)(D)). One who carefully threads his way through this labyrinth comes to the realization that the interest paid on industrial development bonds is exempt from taxation if the bonds come within the "small issue" exception. The ultimate question to be resolved in this case is whether certain bonds issued by the Redevelopment Authority of Philadelphia to plaintiff, the Continental Bank, qualify for the "small issue" exemption.

The crucial issues fall into two categories: (1) whether "substantially all" (defined in the Treasury regulations as at least 90%) of the proceeds of the bond issue were used "for the acquisition, construction, reconstruction or improvement of land or property of a character subject to the allowance

for depreciation" (Code § 103(b)(6)(A)); and (2) whether certain procedural requirements concerning the filing of an election to receive tax-exempt treatment as a "small issue" are applicable and have been adequately complied with. The first set of issues depend upon the correct determination of the "aggregate amount" of the bond issue (*i. e.*, the amount to which the 90% multiplier should be applied), and the correct determination of the amount which was actually spent for purposes permitted under the exemption. The second area of inquiry relates to the propriety of retroactively applying to the plaintiff certain regulations, and the efficacy of plaintiff's attempts to achieve *nunc pro tunc* compliance.

## I.

On June 16, 1971, the Philadelphia Redevelopment Authority executed and delivered to Continental Bank an industrial redevelopment bond in the amount of $3 million. Continental advanced to the Authority the sum of $3 million in the form of a construction loan, which the Authority made available to Ronald Rubin & Co. Pursuant to an installment sale agreement, Rubin agreed to use the funds for the construction of a building at 4th and Market Streets in Philadelphia. Most of the proceeds of this transaction were used for purposes within the "small issue" exemption, but there is a dispute as to two items: a $100,000 real estate commission, and a $72,-000 payment to an affiliate of the Rubin Company for supervising construction of the project.

Eighteen months later, in December 1972, the Redevelopment Authority executed and delivered to Continental Bank a note for an additional $1 million, the proceeds of which were also made available to the Rubin firm. However, substantially all of the proceeds from this latter transaction were not used on the project, but for other purposes.

In its tax returns, Continental Bank did not include as income the interest on these obligations. When the returns were audited, the IRS assessed a deficiency, contending that the interest was taxable. Plaintiff has paid the deficiency, and has brought this action to recover the alleged overpayment.

Plaintiff now concedes that the interest on the $1 million note issued in December 1972 is taxable, but argues that the interest on the original $3 million issue is exempt. The Government argues for taxability of the interest in both cases, on the theory that the two transactions constitute a single "issue" of industrial redevelopment obligations; and that, since less than 90% of $4 million was spent for purposes permitted under the exemption, the exemption does not apply.

The Treasury Department has issued three revenue rulings on the subject of whether multiple obligations constitute one or more "issues" under § 103(c). In Rev. Rul. 74-380, it was held that:

"Three bond issues on the same date pursuant to a single resolution adopted by a political subdivision of a state, to finance three distinctly different parts of a single manufacturing facility to be leased to an industrial corporation, will be considered three separate bond issues provided the security for each bond issuance is kept separate and distinct."

In Rev.Rul. 77-55, the Department ruled that:

"A state's issuance of industrial development bonds in 40 lots of $1 million each on the same day under a single bond indenture, all maintained under a single pooled security by a single trustee, is considered to be a single $40 million issuance that is not an exempt small issue under § 103(b)(6)(A) of the Code, and the interest is not excludable under § 103(a)(1)."

And in Rev.Rul. 78-159, it was stated:

"A state's simultaneous issuance of 25 separate series of industrial development bonds, each series to be issued in the amount of $1 million under a separate bond indenture with the security for each series independent of the proceeds or assets attributable to any of the other series issued concurrently, will be treated as 25 separate exempt small issues and

interest on the bonds will be excludable from the gross incomes of the bondholders . . . ."

In the present case, the Authority issued $3 million in bonds, secured by a mortgage. Eighteen months later, the Authority borrowed an additional $1 million, against the same security. The $3 million transaction took the form of a 30-year bond; the later transaction took the form of a demand promissory note. Each was authorized by a separate resolution of the governing body of the Authority. At the time of the original transaction, none of the parties contemplated that additional borrowings would occur. Indeed, the earliest document mentioning a possible additional borrowing is dated in September 1972, some 15 months after the original transaction.

The revenue rulings reviewed above all involved multiple transactions occurring on the same day. In two of the three cases, the multiple transactions were deemed to constitute a single "issue," but in the third they were not. Apparently, therefore, temporal proximity is a relevant, but not necessarily controlling, factor. More specifically, the fact that two related issues by the same issuer occurred on the same day does not necessarily require treatment as a single issue. These rulings do not, however, address the question whether lapse of time between the two transactions is sufficient, alone, to preclude a finding of a single, aggregate, issuance.

The somewhat analagous regulations concerning arbitrage bonds do address this specific problem. Treasury Reg. § 1.103–13(b)(10) provides:

"(1) Issue: (i) Two or more obligations are part of the same 'issue' if the obligations—

"(A) Are sold at substantially the same time,

"(B) Are sold pursuant to a common plan of financing, and

"(C) Will be paid out of substantially the same source of funds (or will have substantially the same claim to be paid out of substantially the same source of funds)."

"All other facts (such as whether the obligations are offered by the same official statement or are sold under the same indenture) are irrelevant for purposes of this subparagraph."

But even this regulation does not specify the point in time as of which the existence of a common plan of financing is to be determined.

In the present case, it is quite clear that, at the time of the original transaction, the parties did not contemplate any further borrowings. The two transactions did not become constituent elements of even an arguable common plan of financing until at least 15 months later, when the proposal for incremental borrowing was formulated. Thus, under any view of the matter, the $3 million issue constituted a single issue at the time it occurred.

Does the later decision to embark upon a common plan of financing retroactively convert the original, unitary, issue into a constituent element of a larger unitary issue? It seems to me that this question should be answered with a view toward the plain purposes of the aggregation provisions of the statute. It seems clear that the principal thrust of the aggregation provisions of § 103(b)(6)(A) and (D) is to prevent circumvention of the "small issue" limitations. The provisions are designed to preclude parties from carving up a large transaction into a series of smaller transactions so as not to exceed the $1 million or $5 million qualification for "small issue" exemption.

Whether the two transactions in the present case are considered separately or together, and whatever other criticisms may properly be leveled concerning them, it is quite clear that they cannot be viewed as an attempt to evade the $5 million limitation. The initial transaction was for $3 million, the second transaction was for an additional $1 million.

The most that can be said about these transactions, from the Government's point of view, is that, having achieved an exempt $3 million transaction, the parties improperly sought to increase the coverage of the

exemption so as to include an additional $1 million transaction. But, as I read the Code and the related regulations, such an attempt does not destroy the exempt status of the initial transaction; it merely fails to provide exemption for the additional $1 million transaction.

The pertinent Code provisions, § 103(b)(6)(D) read as follows:

"(D) Five million dollar limit in certain cases.—At the election of the issuer, made at such time and in such manner as the Secretary or his delegate shall by regulations prescribe, with respect to any issue this paragraph shall be applied—

"(i) by substituting '$5 million' for '$1 million' in subparagraph (A), and

"(ii) in determining the aggregate face amount of such issue, by taking into account not only the amount described in subparagraph (B), but also the aggregate amount of capital expenditures with respect to facilities described in subparagraph (E) paid or incurred during the six-year period beginning three years before the date of such issue and ending three years after such date . . ., as if the aggregate amount of such capital expenditures constituted the face amount of a prior outstanding issue described in subparagraph (B). . . ."

Since no part of the proceeds from the $1 million transaction was devoted to capital expenditures for a qualified project, it would seem that, whether viewed as of June 1971 or December 1972, the "aggregate amount" for present purposes did not exceed $3 million.

Accordingly, I have concluded that the base figure, to which the 90% "substantially all" factor should be applied, is $2,990,000 (the $3 million issue, less issuing costs of $10,000). Plaintiff contends that $2,806,-197.64 of this sum (amply sufficient to meet the 90% requirement) were appropriately expended. Originally, the Government challenged three items entering into this total: a $300,000 expenditure for land acquisition, a $100,000 item for real estate commission expense, and a $72,000 item for construction supervision. The Government now appears to have conceded that the $300,000 land acquisition expenditure is properly includable; lest there be any doubt on this subject, however, I am satisfied that there is no material dispute of fact that this parcel was properly acquired, pursuant to the May 7, 1971 resolution of the Redevelopment Authority, and that it forms a valid part of the "parcel area" included in the "project." Therefore, unless both of the remaining items are disallowed, the 90% requirement would be met.

The developer paid a real estate brokerage firm a fee of $100,000 for securing the Royal-Globe Insurance Company as the prime tenant of the building. The question is whether this represents an expenditure "for the acquisition . . . of . . . property of a character subject to the allowance for depreciation." Code § 103(b)(6)(A). It is agreed, and the applicable regulations expressly provide, that the pertinent inquiry is whether or not the lease is a depreciable asset under Code § 167. See H.R.Conf.Rpt. No.1533, 90th Cong., 2d Sess. 38 (1968–2 Cum.Bull. 801, 806); Treas.Reg. 1.103–10(b)(1)(ii) (". . . property of a character subject to the allowance for depreciation under § 167").

Treasury Regulation § 1.167(a)–3 provides:

"Intangibles. If an intangible asset is known from experience or other factors to be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy, such an intangible asset may be the subject of a depreciation allowance. . . ."

That the developer expended $100,000 for the acquisition of the intangible asset consisting of the bundle of rights represented by the insurance company's long-term lease cannot be doubted. Equally clear is the fact that the asset was acquired for the production of income, and that its income-producing potential is of known, limited, duration. Unfortunately for plaintiff, however, it seems to be firmly established that a lessor's interest in a leasehold is not a

depreciable asset;[1] brokerage fees paid by lessors are business expenses which must be prorated over the term of the lease. *Commissioner v. Chicago Dock Canal Co.*, 84 F.2d 288 (7th Cir. 1936); *Meyran v. Commissioner*, 63 F.2d 986 (3d Cir. 1933); *Midler Court Realty, Inc. v. Commissioner*, 61 T.C. 590 (1974), *aff'd*, 521 F.2d 767 (3d Cir. 1975).

Indeed, it is undisputed that, in this case, the lessor has not claimed depreciation, but has capitalized the expense and deducted the pro rata share each year. While a valid argument can be made that the purposes of the small issue exemption would not be frustrated if the distinction between depreciation allowance and amortized business expense should be disregarded in this context, the statute and the regulations are quite explicit, and may not be disregarded.

With respect to the $72,000 item for supervising construction, plaintiff appears to be on firmer ground. Plaintiff's affidavits demonstrating the genuineness and validity of this expenditure stand uncontradicted in the record. The Government seems to be making two arguments: (1) that the affidavit of the developer should be rejected as unreliable, because the same affiant, earlier in the litigation, made statements under oath which turned out to be incorrect (it appears that the affiant initially made overly-generous claims concerning the use of the proceeds from the $1 million transaction, but later withdrew these assertions when examination of financial records demonstrated their falsity. Plaintiff seeks to explain this discrepancy by asserting that the initial statements were made from memory, without checking with the accountants who were more intimately familiar with the transactions). And (2) that the alleged supervision of construction should have been the responsibility of the architect, hence there is reason to doubt that the payments were necessary or that the services were actually and adequately rendered.

I am not prepared to reject, as inherently incredible, the affidavits proffered by plaintiff. It seems to me that the defendant has had ample opportunity to develop evidence on this subject. No evidence has been produced, and there is no suggestion that any further evidence will be forthcoming. Moreover, the pertinent issue in this litigation is whether the proceeds from the bond issue were actually expended for a permissible purpose, and not whether the persons paying the money made a good bargain or a poor one. Of course, if there were evidence that the supervision charge was a mere subterfuge for the diversion of money from the project to some other purpose, the result might be different. But I do not believe the vague and inconclusive assertions and surmises put forth by the defendant suffice to raise a significant dispute of fact in this regard. It should be noted that the total amount paid to the architect and to the Rubin enterprise for supervision of construction appears entirely reasonable, in view of the magnitude of the construction project. I therefore see no reason to reject the uncontradicted affidavits proffered by the plaintiff.

For the reasons thus far discussed, I have concluded that the $3 million transaction meets the substantive requirements for exemption as a "small issue." It therefore becomes necessary to address the, one would hope unusual, procedural issues stemming from the content and timing of the pertinent regulations concerning the filing of an election.

## II.

The "small issue" exemption is automatically available for qualified issues of $1 million or less. The exemption is available for larger issues, not exceeding $5 million (at the times relevant to this case; now $10 million) "at the election of the issuer, made at such time and in such manner as the Secretary or his delegate shall by regulations prescribe...." Code § 103(b)(6)(D). No regulations were actually finally adopted and promulgated until July 5, 1972, more than a year after the original $3 million transaction in this case.

---

1. The leased building is depreciable, the land is not. The lessor's interest in the leasehold is not separable from, or additional to, its ownership interest.

The regulations which were adopted on that date, Treas.Reg. § 1.103–10(b)(vi) provide, in pertinent part:

"(a) The issuer may make the election provided by § 103(c)(6)(D) and this subparagraph (assuming that the bonds otherwise qualify under § 103(c)(6)) by means of a statement signed by a duly authorized official that the governmental unit elects to have the provisions as to the $5 million limit in § 103(c)(6)(D) apply to an issue of industrial development bonds. The statement shall be filed prior to the issuance of such industrial development bonds, or, if not previously filed, within 90 days after June 5, 1971, with the District Director or Director of the Regional Service Center with whom the principal user or users of the proceeds of such issue ... are required to file their income tax returns... A copy of such statement shall be attached to the income tax returns of such principal users for such taxable year."

It was not until 1977, when an IRS audit of plaintiff's tax returns first raised the questions now under consideration, that the plaintiff first attempted to comply with these regulations by having the issuer (the Redevelopment Authority) file an election statement.

The regulation is noteworthy in several respects. First, although the statute has been in effect since 1968, the regulation was not adopted until July 5, 1972. Second, although not adopted until July 5, 1972, the regulation purports to establish a September 5, 1971 deadline for compliance (unless the issuer happened to file an election statement before issuing the bonds; as, perhaps, some issuers may have done in anticipation of the actual regulation). Third, the regulation, in conformity with the enabling statute, requires the *issuer* to file a statement of election; the holder of the bonds, the person most directly concerned with the exemption question is not required by the regulation to do anything. The holder's fate is in the hands of others. And, fourth, although the statute requires the filing of an election by the issuer, the regulation goes further, and requires the "principal user" (here, presumably, the developer) to make periodic additional filings.

It is important to bear in mind that the statute gives the issuer the right to elect "small issue" protection for issues in excess of $1 million but less than $5 million; Congress authorized regulations only with respect to the time and manner of making the election. That is, the Secretary was not authorized to render it impossible to achieve exempt status for industrial development issues falling between $1 million and $5 million by the simple expedient of failing to adopt, or deferring the adoption of, regulations concerning the time and manner of filing and election.

The parties have devoted much of their argument to discussions, from their respective points of view, of the general question of retroactivity in IRS regulations. The Government invokes Code § 7805(b):

"(b) *Retroactivity or Regulations or Rulings.* The Secretary may prescribe the extent, if any, to which any ruling or regulation, relating to the Internal Revenue laws, shall be applied without retroactive effect."

Counsel for the Government view this provision as establishing a presumption of retroactivity. The plaintiff, on the other hand, argues that it would be an abuse of discretion for the Secretary to invoke retroactivity in these circumstances. In my view, however, the issue is not whether the regulation is properly applicable to transactions which had already occurred; it seems altogether clear from the wording of Code § 1.103 itself that Congress intended the Secretary's regulations governing the time and manner of filing the election to be applicable to all cases arising under the statute, *i. e.*, to all eligible issues of industrial development bonds. Rather, the issue is whether the regulation is being applied in this case in a manner which accords the plaintiff due process of law.

Notwithstanding the deference which must be accorded to IRS regulations, and the relatively narrow scope of review of such regulations, the statute obviously does

not permit the Secretary to impose procedural requirements which are impossible to fulfill. Thus, to the extent that the 1972 regulation imposes a 1971 deadline for filing an election statement, it is patently invalid. And, in my view, the fact that the regulation, on its face, precluded successful compliance by this plaintiff weighs heavily against penalizing the plaintiff for failing to attempt to comply with the regulation. By the same token, the facial invalidity of the regulation, insofar as it might apply to plaintiff's transaction, is a potent reason for the exercise of the Commissioner's discretion under Treas.Reg. § 1.9100–1:

"(a) The Commissioner in his discretion may, upon good cause shown, grant a reasonable extension of time fixed by the regulations in this chapter for the making of an election [provided]

"(1) the time for making the election is not expressly prescribed by the law;

"(2) request for the extension is filed with the Commissioner before the time fixed by the regulations for making such election or application, or within such time thereafter as the Commissioner may consider reasonable under the circumstances; and

"(3) it is shown to the satisfaction of the Commissioner that the granting of the extension will not jeopardize the interests of the Government."

All of these requirements are met in the present case. Contrary to the Government's assertion, a *nunc pro tunc* filing of the election statement by the issuer involves no prejudice whatsoever to the Government's interests. Since the Government has not yet permitted the issuer to file the required election, it is difficult for me to understand how the developer could have attached a copy of the issuer's statement to his tax returns for the pertinent years. I therefore do not reach the difficult

problem of whether that aspect of the regulation exceeds the Secretary's regulatory scope.[2] Moreover, as a practical matter, the issuer's intention that this be a tax-exempt bond issue has been clear from the beginning, and IRS has long had available to it all of the pertinent information.

In *Taylor v. Commissioner*, 67 T.C. 1071 (1977), the court held, on the basis of its careful review of the reported decisions, that strict compliance with a requirement that an election be filed is mandatory when six circumstances are shown to exist: (1) change of position by the taxpayer concerning choice of options; (2) failure to elect enabled the taxpayer to have the benefit of hindsight; (3) untimely election would prejudice the Government; (4) the filing requirement was clearly specified in the statute or regulation; (5) the required election related to the substance of the statutory scheme; and (6) the untimely election could affect the taxpayer's tax liability for another year. None of these circumstances is present in this case.

As stated by the tax court in *Tipps v. Commissioner*, 74 T.C. 458 (1980):

"Substantial compliance may be sufficient if the regulatory requirements in dispute are procedural or directory in that they are not of the essence of the thing to be done but are given with a view to the orderly and prompt conduct of business, and if the omission of the required material has not operated to respondent's prejudice." (P. 468.)

That is precisely the situation in the present case.

For all of these reasons, I have concluded that plaintiff's attempts to cause compliance with the 1972 regulation constituted substantial compliance with a purely procedural regulation, strict adherence to which is not mandatory; that the Secretary should have permitted the late filing of the

---

**2.** Investment decisions are made by the issuer and the holder at the time the bonds are issued and purchased. While the presumption that the interest is tax-free may be vitiated, in certain limited circumstances, by later capital investments by the developer within the same community, this does not necessarily mean that

the IRS can deny a substantively lawful exemption because the developer fails or refuses to attach a copy of the issuer's election to his later tax returns. And the enabling provisions of Code § 1.103 seem to authorize regulations only with respect to the filing of the election by the issuer.

election notice; and that such substantial compliance and/or improper rejection of the tendered filing suffice to entitle plaintiff to prevail on its claim for refund.

### III.

The parties will be directed to submit a form of order for the entry of a judgment in favor of the plaintiff and against the defendant for the appropriate dollar amount. In their respective Motions for Summary Judgment, both sides have requested the entry of a declaratory judgment with respect to the taxability of interest on the bonds for the remaining years. Since the Declaratory Judgment Act, 28 U.S.C. § 2201, specifically withholds jurisdiction to enter declaratory judgments "with respect to federal taxes," however, no declaratory relief can be afforded in this action.